Minute Order Form (rev. 12/90)

# UNITED STATES DISTRICT COURT, NORTHERN DISTRICT OF ILLINOIS

| Name of Assigned Judge or Magistrate Judge | JAMES F. HOLDERMAN | Sitting Judge if Other Than Assigned Judge | |
|---|---|---|---|
| Case Number | 96 C 8392 | Date | June 27, 2000 |
| Case Title | TC MANUFACTURING CO INC -v- POLYGUARD PRODUCTS INC. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd-party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [use listing in "MOTION" box above]
(2) ☐ Brief in support of motion due _____
(3) ☐ Answer brief to motion due _____ Reply to answer brief due _____
(4) ☐ ☐ Ruling/Hearing on _____ set for _____ at _____
(5) ☒ Status hearing ☐ held ☐ continued to ☒ set for ☐ re-set for 27 JULY 00 at 10:00 am
(6) ☐ Pretrial conf. ☐ held ☐ continued to ☐ set for ☐ re-set for _____ at _____
(7) ☐ Trial ☐ Set for ☐ re-set for _____ at _____
(8) ☐ ☐ Bench Trial ☐ Jury Trial ☐ Hearing held and continued to _____ at _____
(9) ☐ This case is dismissed ☐ without ☐ with prejudice and without costs ☐ by agreement ☐ pursuant to
    ☐ FRCP 4(j) (failure to serve) ☐ General Rule 21 (want of prosecution) ☐ FRCP 41(a)(1) ☐ FRCP 41(a)(2)

(10) ☒ [Other docket entry] Pursuant to Memorandum Opinion and Order entered this day, the court has determined based on the facts presented and the applicable law that the claims of the 381 patent not to be valid.

(11) ☒ [For further detail see ☐ order on the reverse of ☒ order attached to the original minute order form.]

| | No notices required, advised in open court. | | number of notices | |
|---|---|---|---|---|
| | No notices required. | | | Document # |
| ☒ | Notices mailed by judge's staff. | JUN 2 9 2000 | date docketed | |
| | Notified counsel by telephone. | 00 JUN 28 AM 7:57 | | 71 |
| | Docketing to mail notices. | | S.B. docketing dpty. initials | |
| | Mail AO 450 form. | | 6-27-00 date mailed notice | |
| | Copy to judge/magistrate Judge. | | | |
| ⊀ courtroom deputy's Initials | | Date/time received in central Clerk's Office | ✓ mailing dpty. initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| TC MANUFACTURING CO., INC. )<br>)<br>      Plaintiff   )<br>)<br>v.                      )<br>)<br>POLYGUARD PRODUCTS    )<br>INCORPORATED          )<br>)<br>      Defendant.    ) | No. 96 CV 8392<br><br>**DOCKETED**<br><br>**JUN 29 2000** |

MEMORANDUM OPINION AND ORDER

JAMES F. HOLDERMAN, District Judge:

Plaintiff TC Manufacturing Co. ("TC") brought this action for declaratory judgment and has sought a determination that United States Patent 5,120,381 for a Method for Forming a Protective Coating on a Metallic Pipe (hereinafter referred to as "the `381 patent"), which defendant Polyguard Products, Incorporated ("Polyguard") owns, is invalid on the following grounds: indefiniteness; lack of enablement; lack of utility; and obviousness in light of prior art and a public use.

The court's jurisdiction over the subject matter and the parties is pursuant to 28 USC §§1331, 1338, 2201 and 2202.

The issues of the alleged invalidity of the `381 patent were tried to the court in April 2000. Counsel thereafter submitted various post-trial materials including revised proposed findings of fact and conclusions of law. Based on all the evidence submitted including the testimony elicited at the trial in open court (cited as "Tr." followed by page and line references), the exhibits admitted in evidence (cited as "PX" for plaintiff's exhibits, "DX"

71

for defendant's exhibits, and "Joint Exhibit" for those exhibits offered by both sides), the designated portions of deposition testimony (cited by the last name of the deponent followed by "Dep.", with page and line references), and the facts stipulated by the parties (cited as "Stip. Fact" with the number of the paragraph referenced), the court has determined that plaintiff TC has not proven the `381 patent to be invalid by requisite standard of clear and convincing evidence.

In coming to this determination, the court has made the following findings of fact and conclusions of law:

Plaintiff TC is an Illinois corporation with its principal place of business in Evanston, Illinois. Defendant Polyguard is an Oklahoma corporation with its principal place of business in Ennis, Texas. Polyguard has transacted business relating to this action within this judicial district. Polyguard, as stated earlier, is the owner of United States Patent 5,120,381 for a Method for Forming a Protective Coating on a Metallic Pipe. (Stip. Fact 1). The `381 patent issued on June 9, 1992 from patent application Serial No. 576,965 which was filed on September 4, 1990 which was a divisional application of patent application Serial No. 413,129 which was filed on September 27, 1989. (Joint Exhibit 1 and PX 36).

On May 23, 1995, Polyguard requested the U.S. Patent and Trademark Office ("PTO") to reexamine the `381 patent in view of additional prior art that was not considered by the patent examiner in the examination of application Serial No. 576,965. (Joint Exhibit 3 and PX 38). On February 6, 1996, the PTO issued a

Reexamination Certificate for the `381 patent and confirmed the patentability of all eight claims of the original `381 patent. As a result, the claim language of the `381 patent is the same as the claim language of the reexamined `381 patent. (PX 39; Stip. Fact 7). (As used herein, both the `381 patent and the reexamined `381 patent will be referred to collectively as "the `381 patent"). The claims of the `381 patent are each directed to a method of forming a particular type of protective coating on metallic pipe to reduce corrosion of the metallic pipe after it is buried in the ground. (Joint Exhibit 1 and PX 36).

Corrosion is an electrochemical process which occurs under certain conditions because of the electrochemical reaction between a metallic object, such as metallic pipe, and its environment. Typically, corrosion results in the deterioration of the metal object. The electrochemical corrosion process can be explained generally by identifying and defining the parts of an electrochemical corrosion cell. Every electrochemical corrosion cell will contain: (a) an anode, (b) an cathode, (c) an electrolyte, and (d) an electrical conducting path between the anode and the cathode. (Tr. 27:21-29:4 and Tr. 255:23-257:10). Anodes and cathodes are electrodes having different electrical properties whereby electrical current will flow from the anode to the cathode when all of the elements of an electrochemical corrosion cell are present. (Tr. 257:11-18). Corrosion normally occurs at the anode of the corrosion cell. (Tr. 257:21-259:1).

Cathodic protection is a widely used method of protecting buried metallic pipes from corrosion. Cathodic protection occurs when an anode, consisting of a more active metal than the metallic pipe desired to be protected, is electrically connected by a wire to the pipe. Exposed areas of the pipe function as a cathode. (Tr. 261:1-21). When a pipe that is cathodically protected is buried and there is an electrolyte present, such as ground water, electrical current will flow from the anode to the cathode with any corrosion or loss of metal occurring at the more active metal anode instead of the exposed areas of pipe which have become the cathode of the corrosion cell. (Tr. 260:21-261:24).

Cathodic protection, as understood by a person skilled in the art of corrosion protection in 1989, was, and still is, used in conjunction with other protection devices such as coatings that are applied to the outer surface of metallic pipe. Examples of such coatings are fusion bonded epoxy resins, hot applied cold tar or asphalt, extruded polyethylene, glass cloth, asbestos felt and cold applied plastic tapes. (PX 36, the `381 patent at Col. 1, lines 15-21). The cathodic protection occurs in those areas of buried metal pipe where there are holidays, voids, or holes which allow an electrical path to exist in the coating material around the pipe. This electrical path allows the flow of electrical current from the active metal, galvanic anode to the metal pipe cathode. (Tr. 262:5-17). No evidence was introduced as to the exact size of the holes necessary for an electrical path. The court infers that any hole that allows an electrolyte, such as water, to pass through

the coating to the metal pipe is of sufficient size to create an electrical path.

The term "non-shielding" is defined in the `381 patent as "failing to form an electrical shield against cathodic protection as ordinarily understood by those skilled in the art." (PX 36, the `381 patent at Col. 2, lines 65-68). Thus, according to the patent, "non-shielding" occurs when cathodic protection of the pipe is present. As noted above, cathodic protection is present when there is a flow of current from a more active metal anode to an exposed area of the lesser active metal pipe surface which functions as a cathode.

The testimony at the trial demonstrated no disagreement as to the desirability of having non-shielding in those areas of exposed pipe when it is buried. In other words, there is no disagreement that in the areas of exposed pipe wherein a bitumen coating has some holes (also referred to as "holidays"), it is desirable to have a non-shielding environment which allows electrical current to flow from the more active metal anode to the exposed lesser active metallic pipe surface and keeps the lesser active metallic pipe from corroding.

Each of the claims of the `381 patent is directed to a method of forming a "continuous, non-sag, non-shielding protective coating on a metallic pipe." Each of the claims also requires the forming of a laminate that comprises a continuous layer of bitumen on a continuous strip of substantially nonelastic porous support backing of basket weave fabric formed of essentially flat thermoplastic

5

fibers and has a porosity defined in terms of open surface area of about one percent or less but not more than about twenty percent. Thereafter, the laminate is applied to the surface of the pipe by spirally wrapping the laminate around the pipe with the bitumen contacting the pipe surface while applying sufficient tension to the laminate during the wrapping procedure to extrude bitumen through the pores of the support backing in the overlapped areas and to form a bitumen to bitumen seal between the overlapped areas.

One of the key disagreements between the parties is as to the meaning of the term "continuous" regarding the formation of a "continuous, non-sag, non-shielding protective coating on a metallic pipe." The specification of the `381 patent makes numerous references to the formation of voids or holidays in the bitumen between the pipe and the non-porous support backing. Examples of such references to voids or holidays appear in the `381 patent at Col. 6, lines 34-41; Col. 7, lines 24-27; and the last sentence of the "Abstract." Therefore, the specification of the `381 patent clearly encompasses and contemplates holidays in the bitumen layer after it is applied to the metallic pipe in accordance with the steps of each of the method claims. The term "continuous" is defined by the parties' stipulation in this case as "characterized by uninterrupted extension in space; stretching on without break or interruption." (Stip. Fact 19 and PX 31). The court adopts this definition as the meaning of the term "continuous" as used in the `381 patent.

Mr. Norsworthy, whom the court finds to be a person skilled in the art of corrosion protection in 1989, (Tr. 248:10-254:1), testified that in his understanding the term "continuous" as used in the `381 patent means that the material will continue "from one end to the other end without having a break or interruption that actually separates the two [ends of the material] completely." (Tr. 281:19-25). With regard to bitumen layers or coatings such as those discussed in the `381 patent, Mr. Norsworthy testified that in his opinion such bitumen coatings or layers would inherently have holidays or micropores. (Tr. 274:1-23; Tr. 275:1-13; Tr. 283:16-18). On cross-examination, Mr. Norsworthy was asked whether such small holidays or openings were considered to be a defect. He testified that he would not refer to them as a defect, but instead would consider the presence of holidays to be a characteristic of the coating. (Tr. 294:23-295:14). Again on cross-examination, Mr. Norsworthy testified that the presence of holidays or holes in the bitumen coating would be inevitable when performing the steps of the `381 patent. (Tr. 327:1-4). The court finds that Mr. Norsworthy's opinion that the use of the word "continuous" in the `381 patent is not inconsistent with the fact that a bitumen coating is "non-shielding" as defined in the `381 patent.

Mr. Miller, TC's witness, testified that he made no distinction between a hole and a micropore. (Tr. 399:19-21). On cross-examination, Mr. Miller also agreed that all pipeline coatings have micropores and fissures that will eventually permit

7

water to reach the pipe substrate if there was sufficient force or pressure associated with the water. (Tr. 401:6-12).

The court therefore finds that a person skilled in the art of corrosion protection in 1989 would have understood and expected that holidays and micropores would be present in bitumen pipeline coatings of the type described in the `381 patent. The court finds that such small holidays and micropores would not be considered defects in the bitumen layer but instead would be considered by a person skilled in the art to be a characteristic of the bitumen layer. The court further finds that such holidays and micropores would be understood by a person skilled in the art in 1989 to allow an electrolyte, such as water, in the ground to enter such holidays and micropores when a coated pipe is subjected to cathodic protection, the bitumen layer would be non-shielding as defined in the `381 patent. In making this finding, the court is not adding a requirement that the coated pipe be buried. Instead, the court finds that such non-shielding capability is a characteristic of the bitumen layer coating on the pipe.

Plaintiff TC sought to establish that it would not be possible to have a "continuous" bitumen layer that would have a micropores or holidays. TC attempted to establish this by using Plaintiff's Exhibits 76 and 77, (Tr. 107:20-24), which are metallic pipes wrapped in TC's commercially available M860 tape material. Plaintiff's Exhibit 76 is spiral wrapped. (Tr. 44:5-14). Plaintiff's Exhibit 77 is cigarrette wrapped. (Tr. 45:10-14). Demonstrative tests were performed in the courtroom at the trial

8

using a commercially available "holiday detector" to test PX 76 and PX 77. (Tr. 116:17-119:21). The demonstrative tests were performed under courtroom conditions and were not conducted on pipe coatings that had had a long exposure to electrolytes, such as ground water that could and would migrate into minute micropores or holidays in the coatings around the pipes. The court also notes that the holiday detector used in the courtroom experiments had a voltage setting of 5600 volts, (Tr. 117:25-118:2), which did not detect the micropores that exist in the bitumen layer taped around the metal pipe. (Tr. 119:11-22). To trigger the audible sound emitted by the holiday detector when its wand was placed near the tape-covered pipe, Mr. Reeves, at the court's request, created an open exposed puncture hole gouge with a quarter of an inch radius in the coating of PX 77. (Tr. 120:10-121:22). A hole that large, however, is not necessary for an electrolyte, such as water, to permeate a bitumen coating or TC's M860 tape and create a path through which electrical current could pass and corrode the metallic pipe.

Although TC's witness Mr. Reeves initially testified that TC's M860 tape material has no holes or pores, and water would not be transmitted through it, (Tr. 378:19-379:13), the published TC specifications for the M860 tape show that the M860 tape has a maximum water vapor transmission rate of 0.01 perms through the tape. (PX 8 at page 4). Under cross-examination, Mr. Reeves could offer no credible explanation of how the M860 tape material could be completely free of micropores or holidays and yet allow water

9

vapor to pass through it. (Tr. 381:8-392:18). Finally, Mr. Reeves admitted that water could pass through the M860 tape "under the right pressure." (Tr. 392:12-18). This testimony undercuts TC's position.

## I. Indefiniteness

Indefiniteness is, of course, a question of law for the court as the construer of the patent's claims. Personalized Media Communications v. International Trade Commission, 161 F.3d 696, 705 (Fed. Cir. 1998), Credle v. Bond, 25 F.3d 1566, 1576 (Fed. Cir. 1994). TC's contention that the claims of the `381 patent are indefinite under 35 USC §112 is based on TC's position that there is a conflict between the recitation and definition of the term "non-shielding" in the claims of the `381 patent and the described formation of the laminate "continuous" coating around the pipe. In essence, TC contends the presence of holes in a bitumen layer of a coating through which an electrolyte, and thus electric current, may pass is inconsistent with that coating being continuous. The court has determined that the terms "continuous" and "non-shielding" when properly construed are consistent as used in the `381 patent. A material coating a pipe may properly be considered "continuous" if it has no breaks or interruptions in the material coating the pipe, even though the material coating the pipe has pores that allow an electrolyte, such as water, to permeate the coating to the pipe. An example of such a continuous but permeable coating is an unbroken strip of TC's M860 tape applied to a pipe's surface continuously from one end of the strip to the other end.

10

The M860 strip would be properly construed to be continuous from one end of the tape to the other end of the tape, even though the tape itself is sufficiently porous to allow water to permeate the tape as TC's literature on the M860 (PX 8 at page 4) states.

It should also be noted that a similar contention or objection was raised by the PTO's patent examiner during the prosecution of the application that matured into the `381 patent. The prosecution history of the `381 patent was introduced as Joint Exhibit 3 and as Plaintiff's Exhibit 38.

In the office action dated October 18, 1991 at page 2, the patent examiner specifically rejected the claims under 35 USC §112 as being indefinite. The examiner went on to state that the recitation of "non-shielding" was in conflict with the step of wrapping a laminate around the pipe. On pages 2 and 3 of the response after final rejection which was filed on October 28, 1991, the attorney for the patent applicant explained how there was no such conflict. In the Notice of Allowability dated January 28, 1992, the examiner withdrew his previous rejection of the claims as indefinite in view of the explanation in the response after final rejection. Thus, it appears that TC's contentions that the claims are indefinite under 35 USC §112 were considered by the PTO examiner during the prosecution of the application that matured into the `381 patent. The court also notes that the `381 patent underwent reexamination and no further objections or rejections to the claims being indefinite were raised during such reexamination proceedings. (Joint Exhibit 4 and PX 39). In addition to the

11

patent examiner's determination in the prosecution history, Mr. Norsworthy's testified that he understood the patent claims and that he did not consider them to be indefinite. Based on the court's own analysis and construction of the language of the `381 patent and based on the law, as well as all the evidence, plaintiff TC has not proven by clear and convincing evidence that the claims of the `381 patent are invalid on the ground of indefiniteness.

## II. Lack of Enablement

Whether a patent's disclosure is enabling is a question of law for the court. <u>Lindenmann Mashinenfabrik GMBH v. American Hoist and Derrick Co.</u>, 730 F.2d 1452,1463 (Fed. Cir. 1984). TC contends that the `381 patent claims are invalid for lack of enablement because the `381 patent does not teach a person skilled in the art to make and use the claimed invention as required by 35 USC §112. The crux of TC's contention, once again, is that the patent's language does not explain how a "continuous" bitumen layer can be "non-shielding" as defined in the patent. TC further contends that under TC's interpretation of the term "continuous" as having no holes and no voids and the term "non-shielding" which requires holes and holidays "results in a nonsensical construction of the claim as a whole, so the claims are invalid." (Plaintiff's Post-trial Proposed Findings of Fact and Conclusions of Law, paragraph 175, page 71). The court has rejected TC's definition of "continuous" as previously discussed. Additionally, Mr. Norsworthy, who is a person skilled the art, testified that he

understood the specification of the `381 patent and that in his opinion a person having skill in the art of pipe corrosion in 1989 could carry out the process of the invention by reading the patent. (Tr. 283:22-284:9). The court finds Mr. Norsworthy's testimony on this point to be credible and agrees in light of all the evidence in the case. Consequently, TC has failed to prove by clear and convincing evidence that the `381 patent is invalid on the ground of lack of enablement.

### III. Lack of Utility

The existence of utility as required under 35 USC §101 is a question of fact. See Fujikawa v. Wattanasin, 93 F.3d 1559, 1564 (Fed. Cir. 1993). TC contends the invention described is "inoperable" because "A coating (not a support backing)" cannot be both "continuous" and "non-shielding." (Plaintiff's Post-trial Proposed Findings of Fact and Conclusions of Law, paragraph 188, page 76). TC's contention is premised upon its erroneous interpretation of the patent language. Mr. Norsworthy testified that as he understands the invention in his opinion the `381 patent described a useful process. (Tr. 283:19-21). The court finds this testimony credible and, in light of all the evidence, the court finds that TC has failed to prove by clear and convincing evidence that the `381 patent is invalid on the ground of lack of utility.

### IV. Obviousness

The determination of whether a patent is invalid because the invention claimed in the patent was obvious under 35 USC §103 is a legal conclusion based on underlying factual inquiries. WMS Gaming

13

Inc. v International Game Technology, 184 F.3d 1339, 1355 (Fed. Cir. 1999). Plaintiff TC contends that the invention claimed in the `381 patent is obvious in view of the prior art and a public use. Although TC introduced several printed publications as exhibits, it produced no trial testimony or other explanation to show that any of the printed publications are more pertinent than any of the printed publications considered by the patent examiner during the examination of the application that matured into the `381 patent or during the reexamination of the `381 patent.

TC's contention that the invention claimed in the `381 patent is obvious hinges primarily on the deposition testimony of John R. Moon, an employee of Chevron Pipeline Company, regarding the public use installation of M860 tape on a length of pipe, which TC's counsel agreed was not longer than 32 feet, in a creek-bed in Utah in 1987. (Tr. 419:19-22). Mr. Moon's deposition testimony explained that there was a need to have a material that would absorb the impact to protect the coating around the pipe from the impact of rocks and materials in the creek-bed during the Spring runoff. (Moon Dep. 11:1-15). Mr. Moon's testimony was that the pipe he was talking about had a tape material different from TC's M860 tape applied to it, namely TC's 1040 tape material and that the M860 tape was wrapped over the 1040 wrap tape to provide some sort of mechanical protection. (Moon Dep. 12:16-13:6; Moon Dep. 15:1-11 and Moon Dep. 28:14-16). From this testimony, the court finds that the M860 tape was not applied by Chevron personnel in 1987 to the metallic pipe directly, but was wrapped around and over

14

the existing 1040 tape coating which had previously been wrapped around the metallic pipe. It was Mr. Moon's intent to provide physical, mechanical protection to the 1040 tape so Chevron Pipeline Company personnel would not have to go back and continually repair the 1040 tape coating on the pipe. (Moon Dep. 17:18-24).

During the prosecution of the application that matured into the `381 patent, the patent examiner cited a prior art reference that taught saturating a cloth woven from glass fibers with pitch, asphalt, cold tar residue and the like and wrapping it around a pipe in a helical manner. In the office action dated June 12, 1991 at page 5, the Pflaumer reference is discussed. (Joint Exhibit 3 and PX 38). In distinguishing over this reference, the attorney for the applicant discussed the Pflaumer reference on page 6 of the amendment that was received in Group 180 of the PTO on July 17, 1991. In that discussion, the reference was distinguished over by pointing out the claimed invention was not to protect the underlying pipe from physical abuse. Additionally, the attorney for the applicant pointed out that the term cathodic shielding was not directed to any type of physical shielding as was suggested by the examiner. (See page 2, third paragraph of amendment received Group 180 on July 17, 1991).

After reviewing Mr. Moon's deposition testimony regarding the Utah job, it is the court's finding that the M860 tape was not applied to the metallic pipe's surface and is therefore clearly not covered by the claims of the `381 patent. Therefore, Chevron's use

15

of TC's M860 tape in Utah did not anticipate the claims of the `381 patent. Additionally, Chevron's use of TC's M860 tape in Utah for the purpose of providing physical protection to other pipeline coating material, namely TC's 1040 tape, would not make it obvious to one skilled in the art to carry out the process claimed in the `381 patent.

Polyguard presented testimony to establish the commercial success of the method claimed in the `381 patent. Mr. Muncaster, Polyguard's president, testified that the Polyguard RD6 product is the pipeline coating product that is referred to in the `381 patent. (Tr. 336:1-13). He also testified that the sales of this product have increased and that he considers it to be a commercial success. (Tr. 336:14-337:20). Mr. Robert Nee, Vice-President of Polyguard Pipeline Division, Sales and Marketing, also testified that he considered the method claimed in the `381 patent to have been a commercial success. (Nee Dep. 8:11-20). Mr. Nee testified that in 1989 there had been a long felt need for forming a continuous, non-sag, non-shielding coating on pipelines. (Nee Dep. 8:3-10). Mr. Norsworthy testified that in his opinion that in 1989 there was a need for improved pipeline coatings and that the `381 patent invention satisfied that need. (Tr. 271:3-272:3).

The court has determined that the prior art publications presented by TC and the testimony concerning Chevron's use of TC's M860 tape in 1987 on the 32-foot stretch of creek-bed pipeline in Utah are no more pertinent than the prior art considered by the patent examiner during the examination of the `381 patent

16

application. In view of this, it is the court's opinion that the claims of the `381 patent are not obvious within the meaning of 35 USC §103. Polyguard presented evidence showing secondary considerations such as commercial success of methods within the scope of the claims of the `381 patent and a long felt need in the industry of improved non-shielding protective coatings at the time of the invention that is claimed in the `381 patent. As an indicia of obviousness or nonobviousness, such testimony has relevance here and bolsters the court's opinion that the claims of the `381 patent are not obvious. <u>Graham v. John Deere Co.</u>, 383 U.S. 1, 17-18 (1966).

The `381 patent must be accorded a statutory presumption of validity pursuant to 35 USC §282. As with all patents issued by the PTO, the `381 patent resulted from an examination of the application for patent by patent examiners of the PTO who are assumed to have expertise in interpreting the prior art references and who are familiar from their work with the level of skill in the art.

The court has concluded that the specification of the `381 patent taken as a whole contains an appropriate written description of the invention and the manner and process of using it in such full, clear, concise and exact terms as to enable a person skilled in the art to which it pertains to carry out the process. Therefore, the court is of the opinion that the patent specification meets the requirements of the first paragraph of 35 USC §112. The court is also of the opinion that claims of the

17

`381 patent particularly point out and distinctly claim the subject matter of the disclosed invention and are understood by those persons having ordinary skill in the art. TC has not come forward with clear and convincing evidence to convince the court otherwise.

### Conclusion

In sum, it is the court's opinion that TC has not met its burden of coming forward with such clear and convincing evidence as to render the claims of the `381 patent invalid. The court therefore has determined based on the facts presented and the applicable law that the claims of the `381 patent not to be invalid. Counsel are encouraged to discuss settlement and report on the status of the case on July 27, 2000 at 10:00 a.m.

ENTER:

JAMES F. HOLDERMAN
United States District Judge

DATED: June 27, 2000